UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION IN LAFAYETTE

| | | |
|---|---|---|
| RYAN D. GEREN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 4:10-CV-89 RM |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant | ) | |

## OPINION AND ORDER

Ryan Geren seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income under the Social Security Act, 42 U.S.C. §§ 423 and 1381 *et seq.*. The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3). For the reasons that follow, the court affirms the Commissioner's decision.

## I. BACKGROUND

Mr. Geren asserted disability due to obesity, sarcoidosis, bipolar disorder, major depression disorder, and a history of alcohol and marijuana abuse. His applications were denied initially, on reconsideration, and after an administrative hearing at which he was represented by counsel.

The ALJ considered the documentary evidence presented at and after the hearing and testimony from Mr. Geren and a vocational expert, George Parsons.[1] Applying the agency's standard five-step analysis, 20 C.F.R. §§ 404.1520 and 416.920, the ALJ found that Mr. Geren had not engaged in substantial gainful activity since the asserted onset date (step one), and had severe impairments (obesity, a history of sarcoidosis, depression, and a substance abuse disorder) (step two), that didn't meet or equal the requirements of Listings 3.02 (chronic pulmonary insufficiency), 12.04 (affective disorders), and/or 12.09 (substance addiction disorders)(step three), but precluded the performance of his past relevant work as a forklift operator, truck driver, and construction and factory laborer (step four). The ALJ concluded at step five that Mr. Geren wasn't disabled within the meaning of the Social Security Act because he could perform other jobs that existed in significant numbers in the national economy, and wasn't entitled to benefits.

The Appeals Council denied Mr. Geren's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security. Getch v. Astrue, 539 F.3d 473, 480 (7th Cir. 2008); Fast v. Barnhart, 397 F.3d 468, 470 (7th Cir. 2005). This appeal followed.

---

[1] Kaci Mislivecek, a case manager at Wabash Valley Hospital, also testified at the hearing. Ms. Mislivecek helped Mr. Geren with his application for Medicaid and appears to have been called as a witness for the purpose of verifying medical information contained in hospital records, and identifying the possible side effects of medication he was taking. The ALJ found that she wasn't qualified as a medical expert, and Mr. Geren doesn't challenge that determination on appeal.

Medical records from Eastern State Hospital in Lexington, Kentucky, indicate that Mr. Geren was a 26 years old, recently divorced father of three, living in Kentucky and working as a truck driver in September 2008, when he became inebriated, got into an argument with his girlfriend, cut his arm, and was hospitalized under to a 72-hour commitment order. (AR 605-705). On admission, Mr. Geren said "[t]hings were great when [he and his girlfriend] were not drinking," but "not so great when we are drinking," and that "his personality significantly changes when he is inebriated and [he] not only experiences what he called blackout spells, but periods of rage or impulse discontrol, but not when he is not inebriated." (AR 610-11). Attending physician Dr. Anthony Siegel noted on admission that: Mr. Geren was alert and oriented to person, place, time and circumstance; his speech was normal; his memory appeared intact to immediate, recent and remote, except for times in which he is inebriated; his affect was broad in range and appropriate; he was pleasant, cooperative, engaging and displayed a good sense of humor; his fund of knowledge appeared to be average to gross testing; he denied current suicidal ideations or intent; and his judgment was significantly impaired, particularly when drinking, and insight was of adequate capacity. (AR 611-12). Dr. Siegel further noted that "[t]here was no evidence of manic symptomatology noted or elicited." (AR 612). Mr. Geren was discharged after five days with a diagnosis of substance induced mood disorder and alcohol dependence. (AR 670). At the time of discharge, he was quiet and cooperative,

denied any suicidal ideations, and performed activities of daily living without difficulty. (AR 607).

In February 2009, Mr. Geren was admitted to Eastern State Hospital for a second time, again under court order, after he walked into a police station and told officers that didn't want to live anymore and had tried to harm himself by walking in front of vehicles. (AR 467-604). Mr. Geren reportedly had broken up with his girlfriend, was homeless, had no primary support in the area, was in arrears on child support, and had a pending court date regarding child support. Madonna Beard, the mental health professional who signed the certification for 72-hour hospitalization, stated that Mr. Geren hadn't been compliant with outpatient treatment and didn't keep appointments after his 2008 hospitalization, and that hospitalization could help stabilize Mr. Geren's mood, and help him return to better thoughts, feelings and behavior, and no longer be a threat to himself. (AR 525). Mr. Geren was discharged seven days later, with a referral for outpatient services. His treating physician, Dr. Muhammad Ashfaq, prescribed medication (Seroquel, Celexa, and Trazadone), diagnosed adjustment disorder with depressed mood, alcohol dependence, and cannabis dependence, with antisocial personality traits, and gave Mr. Geren a GAF score of 55-60. (AR 570-71).

Mr. Geren returned to Indiana after his discharge from Eastern State Hospital, and moved in with his parents. Medical records from Wabash Valley Hospital in West Lafayette, Indiana, indicate that Mr. Geren began outpatient

treatment there in March 2009. (AR 435-61, 816-871). Mr. Geren attended individual therapy sessions with various counselors at Wabash Valley Hospital between March 2009 and February 2010,[2] and saw a psychiatrist, Dr. Zeinab Tobaa, for an initial evaluation and pharmacologic management. (AR 850, 854-55, 858, 861, 863 and 865-66).

In her initial evaluation in March 2009, Dr. Tobaa opined that Mr. Geren suffered from bi-polar disorder with a history of alcohol and marijuana addiction and had a GAF of 40, but noted that Mr. Geren had reported that he'd been without medication for about three days, and that his symptoms were "a lot worse since he ran out." (AR 431-32).

In an annual case summary update completed in February 2010 by Cathy Ticen, one of Mr. Geren's counselors at Wabash Valley Hospital, Ms. Ticen reported that:

> Per Dr. Tobaa's notes and client report in session along with clinical observations made during sessions, the client has exhibited stability of mood for the majority of the last year. The client reports that his medications along with use of coping skills help him to manage depression, anger, and anxiety symptoms. The client has also experienced an absence of suicidal ideation over the last year per

---

[2] The medical records from Wabash Valley Hospital indicate that Mr. Geren received individual therapy from Loretta Cain, MSW, on March 30, 2009 and April 14, 2009 (AR 862, 864); from Rachel Johnson, MSW, on June 8, 2009 (AR 860); and from Cathy Tichen, LMHC, on August 19, 2009, October 28, 2009, December 24, 2009, January 21, 2010 and February 25, 2010 (AR 848, 851-53, 856-57). The court notes, however, that the records also contained a copy of a letter dated May 12, 2009 from Loretta Cain to Mr. Geren, in which Ms. Cain states that she hadn't seen Mr. Geren since March 30, 2009, that he'd "missed several scheduled appointments," and that his chart would be closed if he didn't attend a scheduled therapy appointment by June 1, 2009. (AR 459). No explanation for the discrepancy was provided, but the court will assume for purposes of this appeal that the progress notes accurately reflect the dates and nature of services provided.

his report. In addition, he has abstained from abusing alcohol and drugs. In addition, the client has demonstrated insight that his past suicide attempts and anger outbursts were largely linked to substance abuse.

(AR 837-38). Ms. Ticen updated Mr. Geren's diagnosis sheet to reflect Dr. Tobaa's "current diagnoses" of bipolar disorder with alcohol dependence (full remission) and cannabis abuse (full remission). (AR 838).

In a psychiatric review technique form completed in April 2010, Dr. Tobaa indicated that Mr. Geren had reported symptoms of: memory impairment, disturbance in mood, emotional lability and impairment in impulse control (organic mental disorders under Listing 12.02); depressive syndrome, manic syndrom, and bipolar syndrome (affective disorders under Listing 12.04); and anxiety (Listing 12.06). (AR 873-885). Based on those reports, Dr. Tobaa opined that Mr. Geren had a "marked" degree of functional limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace, and had three episodes of decompensation, each of extended duration.[3] (AR 883).

In a statement of mental ability to do work-related activities completed the same day, Dr. Tobaa indicated that Mr. Geren had only slight limitations in his ability to understand, remember, and carry out short simple instructions, but had marked limitations (indicating that the ability to function was severely limited but

---

[3] Dr. Tobaa noted that: "Over the past year, client identified 3 periods of time where he locked himself in his room and struggled to fight stress and emotions. He noted that staying in the room would be for 3 days. After that, he noted it would take at least a week to feel slightly better." (AR 883).

not precluded) in his ability to understand, remember, and carry out detailed instructions, and to make judgments on simple work-related decisions. (AR 887). Dr. Tobaa also indicated that Mr. Geren had marked limitations in his ability to interact appropriately with the public, supervisors, and co-workers, to respond appropriate to work pressures in a usual work setting, and to changes in a routine work setting. (AR 888). When asked what supported her assessment, Dr. Tobaa simply stated:

> [The] client feels that he would scare people with his anger. He is impulsive and has a short anger fuse. He is afraid he would get upset and hit people no matter what their position (coworker, consumer, supervisor). Client stated that he is likely to cuss people out [and] walk off a job if it gets too stressful or he has to change.

(AR 888).

In April 2009, Mr. Geren was referred to Chad Pulver, Ph.D., a psychologist, for a mental status evaluation. Dr. Pulver diagnosed major depression without psychic features, and indicated that Mr. Geren's GAF score at the meeting was 45. (AR 393-94).

During a second evaluation in March 2010, Dr. Pulver administered the WAIS and MMPI-2-FT, and concluded that Mr. Geren's full scale IQ (75) was "below average," his processing speed was "extremely low," his MMPI scores indicated a "pattern of high endorsement of symptoms including negative mood, physical and cognitive problems, and suicidal/death ideations," and that the high doses of medication "result[ed] in better mood stabilization, but continued life

disruption." (AR 891-92). Dr. Pulver diagnosed recurrent major depression, and opined that Mr. Geren had a GAF score of 48 at the meeting. (AR 892).

In a psychiatric review completed in April 2010, Dr. Pulver opined that Mr. Geren suffered from an affective disorder under Listing 12.04 (depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking and thoughts of suicide); that resulted in "extreme" limitations in activities of daily living and maintaining social functioning, and "marked" limitations in maintaining concentration, persistence or pace; and that he had a "medically documented history of [an] affective (12.04) disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and repeated episodes of decompensation [four or more], each of extended duration." (AR 894-907). Dr. Pulver indicated in a medical source statement completed the same day that Mr. Geren's mental impairment didn't affect his ability to understand, remember or carry out instructions, but that he had "marked" limitations (ability to function is severely limited but not precluded) in his ability to interact appropriately with the public, supervisors and co-workers, and "extreme" limitations (no useful ability to function) in his ability to respond appropriately to work pressures and changes in a routine work setting. (AR 909-911). When asked what supported this assessment, Dr. Pulver stated: "Recent work history indicates

an inability to work [with] others or to take instruction well from superiors." (AR 910).

State agency psychologist Stacia Hills, Ph.D. reviewed the evidence submitted before the administrative hearing and completed a psychiatric review (AR 396-409) and mental residual functional capacity (AR410-413) in which she opined that Mr. Geren suffered from major depression without psychotic features (an affective disorder) that didn't satisfy the diagnostic criteria of Listing 12.04. Dr. Hills indicated that Mr. Geren had mild restriction of daily living and difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence or pace, and no episodes of decompensation of an extended duration, under the criteria in Listing 12.04(B), and no evidence of the criteria in Listing 12.04(C). (AR 406-07). In her assessment of mental residual functional capacity, Dr. Hills found that Mr. Geren had moderate limitations with respect to his ability to understand, remember and carry out detailed instructions, and to maintain attention and concentration for extended periods, but found no significant limitations in any of the other functions itemized on the assessment form. (AR 410-412). Dr. Hill summarized Mr. Geren's statements regarding his activities and symptoms and opined that:

> [Mr. Geren's] allegations appear credible and consistent with [mental evaluation]. However, in terms of level of severity of functioning, [his] allegations appear partially credible given [activities of daily living] appear [within normal limits] but primarily limited by physical issues, attention/concentration are moderately impacted but appear reasonable for simple tasks. While it is expected that the claimant would be unable to complete complex tasks, claimant would be able

to complete repetitive tasks on a sustained basis without special considerations.

(AR 412).

At the March 2010 administrative hearing, Mr. Geren testified that the most serious problems he had that interfered with his ability to work were pain in his back and knees and his inability to get along with other people. (AR 46-48). He said he stopped working as a truck driver in 2008 because "[his] therapist and a doctor" recommended it, "[he] was trying to put [his] family back together," and he couldn't pass the DOT physical. (AR 53-55). Mr. Geren also testified that he experienced anxiety four or five times a week that could last anywhere from five minutes to an hour, and that anxiety could bring on temper outbursts. (AR 57-58). He said he didn't think he could live alone and that his parents took care of most of the household chores, but didn't say why and indicated that he has his three children every summer for four weeks, visits the children and his girlfriend in Kentucky "once every couple months", goes to AA meetings, appointments at Wabash Valley Hospital, and church, and spends his days watching movies and TV, using the computer, occasionally reading, can drive, hasn't used drugs or alcohol since February 2009, and hasn't had any criminal problems since he stopped drinking. (AR57-73).

## II. DISCUSSION

Mr. Geren was represented by counsel at the administrative hearing, and "is presumed to have made his best case before the ALJ." Skinner v. Astrue, 478 F.3d 836, 842 (7th Cir. 2007); Sears v. Bowen, 840 F.2d 394, 402 (7th Cir. 1988); Glenn v. Secretary of Health and Human Services, 814 F.2d 387, 391 (7th Cir. 1987). Although he asserted disability based on both physical and mental impairments, the ALJ found no credible objective medical evidence of pulmonary insufficiency, respiratory impairment, or orthopedic impairment. Mr. Geren doesn't challenge those findings on appeal, and addresses only the sufficiency of the ALJ's findings with respect to his mental impairments. He contends that medical evidence in the record supports a finding of disability, and that the ALJ erred in failing to give that evidence greater weight and in failing to include his findings with respect to limitations in concentration, persistence and pace in his hypothetical to the vocational expert.

The issue before the court isn't whether Mr. Geren is disabled, but whether substantial evidence and the law support the ALJ's decision that he was not disabled. Cass v. Shalala, 8 F.3d 552, 555 (7th Cir. 1993). The court can't substitute its own judgment by "reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." Williams v. Apfel, 179 F.3d 1066, 1071-1072 (7th Cir. 1999); *accord* Powers v. Apfel, 207 F.3d 431, 434-435 (7th Cir. 2000). The ALJ doesn't need to address every piece of evidence in the record, but he "must provide a 'logical bridge' between the evidence and his conclusions." O'Connor-Spinner v. Astrue, 627 F.3d 614, 618

(7th Cir. 2010); <u>Getch v. Astrue</u>, 539 F.3d 473, 480 (7th Cir. 2008); <u>Giles ex rel.</u> <u>Giles v. Astrue</u>, 483 F.3d 483, 486 (7th Cir. 2007). If the ALJ does so, the court must affirm the Commissioner's decision. <u>Skinner v. Astrue</u>, 478 F.3d 836, 841 (7th Cir. 2007); <u>Rice v. Barnhart</u>, 384 F.3d 363, 368-369 (7th Cir. 2004); <u>Clifford</u> <u>v. Apfel</u>, 227 F.3d 863, 869 (7th Cir. 2000).

### A. *Severity of Impairments and Residual Functional Capacity*

Mr. Geren contends that the opinions of his treating psychiatrist, Dr. Tobaa, and examining psychologist, Dr. Pulver, should have been given greater weight, and that the ALJ failed to consider relevant factors in evaluating those opinions (*i.e.*, whether they were a treating or examining source, the length, nature and extent of the treatment relationship, consistency, supportability, and specialization). Citing <u>Larson v. Astrue</u>, 615 F.3d 744, 751 (7th Cir. 2010); 20 C.F.R. §§ 404.1527, 416.927; SSR 96-2p. Mr. Geren also contends that the ALJ ignored the opinions of Dr. Tobaa and Dr. Pulver because they were solicited by his attorney after the administrative hearing, ignored objective findings supporting the opinions, failed to mention the GAF score Dr. Tobaa recorded in March 2009 and her notations regarding GAF on subsequent progress notes, and "cherry-picked" what he reviewed. A review of the record indicates otherwise.

A treating physician's opinion is entitled to "controlling weight" if "well supported by medical findings and not inconsistent with other substantial evidence in the record." <u>Clifford v. Apfel</u>, 227 F.3d at 870; <u>see</u> <u>also</u> 20 C.F.R. §

12

404.1527(d)(2). Failing an entitlement to controlling weight, social security regulations establish guidelines for the ALJ to apply in determining the weight to afford to these types of opinions. See 20 C.F.R. § 404.1527(d); Butera v. Apfel, 173 F.3d 1049, 1056-1057 (7th Cir. 1999).

The ALJ found that Dr. Tobaa's opinion wasn't persuasive and gave it "limited weight" because it was completed after the hearing "to make a record for disability," was based almost entirely on statements made by Mr. Geren, and wasn't supported by any objective clinical findings. Substantial evidence in the record supports the ALJ's findings with respect to Dr. Tobaa's opinions.

Dr. Tobaa's diagnosis and assessment of Mr. Geren's functional limitations appears to have been based almost entirely on statements by Mr. Geren. She provided no objective medical findings supporting a diagnosis of bipolar disorder, manic syndrome, or the marked functional limitations indicated in her April 2010 assessment, or in the progress notes from Wabash Valley Hospital.

The Wabash Valley Hospital medical records indicate that Mr. Geren began outpatient treatment there in March 2009. He attended eight individual therapy sessions with various counselors between March 2, 2009 and February 25, 2010, and saw Dr. Tobaa only eight times for a total of two hours and forty-five minutes — once for the hour-long initial interview and evaluation on March 10, 2009, and seven times for pharmacologic management, which, according to the progress notes, lasted approximately 15 minutes a session. In her initial evaluation, Dr. Tobaa opined that Mr. Geren suffered from bi-polar disorder with a history of

alcohol and marijuana addiction.[4] That evaluation appears to have been based entirely on statements made by Mr. Geren, wasn't consistent with prior diagnoses from treating physicians at Eastern State Hospital, and didn't indicate what the objective basis was for the diagnoses. Dr. Tobaa indicated that Mr. Geren had a GAF of 40 at the March 2009 interview, but noted that Mr. Geren reported that he'd been without medication for about three days, and that his symptoms were "a lot worse since he ran out."[5] Dr. Tobaa made no mention of bi-polar disorder again until February 2010. In all prior pharmacologic management sessions she consistently noted that Mr. Geren suffered from depression, anxiety and/or mood swings. (AR 854-55, 858, 861, 863 and 865).

The ALJ didn't discuss Dr. Tobaa's assessment of Mr. Geren's GAF (Global Assessment of Functioning) at the initial interview, or the conclusory notations regarding GAF at the bottom of Dr. Tobaa's progress notes, but the law doesn't require an ALJ to determine the extent of a disability based on an unexplained GAF score,[6] <u>Denton v. Astrue</u>, 596 F.3d 419, 425 (7th Cir. 2010); <u>Howard v.</u>

---

[4] CathyTichen updated Mr. Geren's diagnosis sheet on February 17, 2010 "to reflect Dr. Tobaa's current diagnoses" of bipolar disorder with alcohol dependence (full remission) and cannabis abuse (full remission). (AR 838).

[5] Mr. Geren's treating psychiatrist at Eastern State Hospital, Dr. Muhammad Ashfaq noted a significantly higher GAF of 55-60 when Mr. Geren was discharged on February 19, 2009. (AR 571).

[6] A GAF score measures a "clinician's judgment of the individual's overall level of functioning," and is intended to be used to make treatment decisions. American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 32 (4th Ed. Text Rev.2000). "[T]he score does not reflect the clinician's opinion of functional capacity." <u>Denton v. Astrue</u>, 596 F.3d 419, 425 (7th Cir. 2010).

Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir.2002) (GAF score may assist ALJ in formulating claimant's residual functional capacity, but is not essential), or to address every piece of evidence in the record. O'Connor-Spinner v. Astrue, 627 F.3d at 618; Getch v. Astrue, 539 F.3d at 480 .

The ALJ gave no weight to Dr. Pulver's 2010 assessments because they were inconsistent with his original assessment and other evidence in the record, and weren't supported by any objective clinical findings, and because Dr. Pulver didn't observe Mr. Geren in a work situation. Substantial evidence supports his findings.

Dr. Pulver indicated in April 2009 that Mr. Geren suffered from major depression without psychotic features, but a year later opined that he suffered from depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking and thoughts of suicide; that resulted in "extreme" limitations in activities of daily living and maintaining social functioning, and "marked" limitations in maintaining concentration, persistence or pace; and that he had a "medically documented history of [an] . . . affective (12.04) disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and repeated episodes of decompensation [four or more], each of extended duration." Dr. Pulver's later opinion is inconsistent with the opinions of Mr. Geren's treating physicians at Eastern State Hospital, the progress notes from Mr. Geren's

individual therapy sessions, and Dr. Hill's assessment of the severity of Mr. Geren's mental impairments and his mental residual functional capacity, and isn't supported by objective medical evidence. When asked to provide support for his assessment, Dr. Pulver simply stated: "Recent work history indicates an inability to work [with] others or to take instruction well from superiors." As the ALJ correctly noted, Dr. Pulver never saw Mr. Geren in a work situation, and relied instead on Mr. Geren's undocumented statements about his work history.

Dr. Pulver indicated in March 2010 that Mr. Geren's WAIS results indicated that his full scale IQ (75) was "below average," his processing speed was "extremely low," that his MMPI scores indicated a "pattern of high endorsement of symptoms including negative mood, physical and cognitive problems, and suicidal/death ideations," and that the high doses of medication "result[ed] in better mood stabilization, but continued life disruption." Those findings are inconsistent with Mr. Geren's own testimony at the hearing, statements made by him to other treating sources, and other evidence in the record, and weren't cited as the basis of Dr. Pulver's opinions about Mr. Geren's mental impairments and mental residual functional capacity.

The ALJ gave due consideration to the fact that Dr. Tobaa's had been Mr. Geren's treating psychiatrist since March 2009, and that Dr. Pulver had, at least briefly, examined Mr. Geren on two occasions, and gave limited or no weight to their opinions because they were based almost entirely on Mr. Geren's self-serving reports, weren't supported by objective medical findings, and weren't consistent

with other substantial evidence in the record, including the opinions of Mr. Geren's treating physicians at Eastern State Hospital, Dr. Pulver's initial evaluation in April 2009, reports from Cathy Ticen, Mr. Geren's counselor at Wabash Valley Hospital, which indicated that he had been stable for several months and that his alcohol and cannabis dependence were in total remission, and Mr. Geren's own testimony regarding his activities — not because they were solicited by Mr. Geren after the hearing.

Mr. Geren raised a cursory challenge to the ALJ's assessment of his credibility, contending that the ALJ's reasons for rejecting his testimony were consistent with his reasons for not giving weight to the opinions offered by Dr. Tobaa and Dr. Pulver, and that a reversal and remand to further evaluate either or both of those opinions would also require reconsideration of Mr. Geren's credibility. In his reply brief, Mr. Geren expressly acknowledged that he "is not contending that this is a separate reason for remand." The court agrees. An ALJ's credibility determination is entitled to great deference, Herron v. Shalala, 19 F.3d 329, 335 (7th Cir. 1994); Ehrhart v. Secretary of Health and Human Servs., 969 F.2d 534, 541 (7th Cir. 1992), and a court won't upset that determination unless it is "patently wrong." Luna v. Shalala, 22 F.3d 687, 690 (7th Cir. 1994). Substantial evidence in the record supports the ALJ's assessment of Dr. Tobaa's and Dr. Pulver's opinions, and Mr. Geren doesn't contend, nor has he shown, that the ALJ's assessment of his credibility was patently wrong.

*B. The Hypothetical*

The burden at step 5 of the disability evaluation is on the Commissioner to show that the claimant can perform other work that "exists in significant numbers in the national economy." 20 C.F.R. 404.1560(c)(2); *see also* <u>Overman v. Astrue</u>, 546 F.3d at 464; <u>Britton v. Astrue</u>, 521 F.3d 799, 803 (7th Cir. 2008). The Commissioner can meet that burden by relying on information contained in the *Dictionary of Occupational Titles* (DOT), SSR 00-4p; 20 C.F.R. §§ 404.1566(d)(1) and 416.966(d)(1), or on testimony from a vocational expert. 20 C.F.R. §§ 404.1566(e) and 416.966(e). The ALJ found that Mr. Geren had the residual functional capacity to perform light work that was limited to the performance of simple, repetitive tasks, and superficial interactions with supervisors, coworkers or the general public, and didn't involve concentrated exposure to pulmonary irritants and temperature extremes. (A.R. at 32). At the hearing, the ALJ asked vocational expert George Parsons whether a person of Mr. Geren's age, with the same education, work experience, and functional capacity, could perform Mr. Geren's past relevant work, or any other work in the region. (A.R. at 81-82). Mr. Parsons agreed that Mr. Geren's past relevant work as a cashier, which the DOT describes as light work, would be precluded because it involved semi-skilled work, and the hypothetical restricted the individual to simple, repetitive tasks, but testified that there were other jobs in the State of Indiana that he could still perform, including work as a freight stock clerk (1,300 in Indiana/47,000 nationally), lot attendant (735 in Indiana/67,000 nationally), hand packer (8,000

in Indiana/315,000 nationally), janitor (3,000 in Indiana/132,000 nationally), and electrical assembler (1,000 in Indiana/38,000 nationally). (A.R. at 82-83). Mr. Parsons indicated that a number of those jobs were available at the sedentary and medium exertional levels. (A.R. 83-84). When asked whether his testimony was in accordance with information contained in the Dictionary of Occupational Titles, Mr. Parsons said it was. (A.R. 84).

On cross-examination, Mr. Geren's attorney asked the vocational expert if all work would be excluded if he "assum[ed] the Judges's hypothetical for medium [work] with the limitations that he gave," but added a "marked limitation" (which counsel defined as "seriously limited but not precluded") in the individual's ability to interact with supervisors, and "no useful ability" to interact with coworkers, respond appropriately to work pressure in a usual work setting or respond appropriately to changes in a routine work environment. (AR 84-85). Mr. Parsons testified that those limitations wouldn't "necessarily" preclude all work, and that "it would probably limit him to such jobs as janitorial services." (AR 85). Mr. Parsons said work as a janitor wouldn't be precluded if the person had no functional ability to interact with supervisors or the public, but the person would "probably lose his job." (AR 85).

Mr. Geren contends that the ALJ found that he had moderate difficulties with concentration, persistence or pace, and erred in failing to include those limitations in his  hypothetical to the vocational expert. Mr. Geren's argument ignores the distinction between the ALJ's findings about the severity of his

impairments at step 3 and his residual functional capacity at step 4. *See* Allbritten v. Astrue, 2012 WL 243566 at *7 (N.D. Ind. Jan. 25, 2012) (ALJ's finding of moderate difficulties in concentration, persistence, or pace were made at step three "and the evaluation at step three is separate from the evaluation of RFC.").

Relying on the psychiatric review completed by state agency psychologist Dr. Stacia Hill (AR 396-409), Mr. Geren's medical records from Eastern Kentucky State Hospital (AR 466-705), and Mr. Geren's testimony at the hearing, the ALJ found at step three that Mr. Geren's mental impairments didn't meet or equal the severity of Listing 12.04 or 12.09 under the criteria listed in paragraph B or C because he had only mild restriction of activities of daily living, and moderate difficulty in social functioning, and concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. The ALJ noted that:

> The limitations identified in the "paragraph B" criteria *are not a residual functional capacity assessment* but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 . . . requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B . . . (SSR 96-8p) (emphasis added).

Relying on Dr. Hill's mental residual functional capacity assessment and medical evidence regarding Mr. Geren's physical impairments, the ALJ found that Mr. Geren had moderate limitations with respect to only three of the itemized mental functions — the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, and the ability to maintain attention and concentration for extended periods — and incorporated those limitations

sufficiently in his hypothetical to the vocational expert when he asked the vocational expert:

> to assume a hypothetical individual of the claimant's age, education and work experience who can only work at the light level because of the following limitations: requires an environment relatively free of noxious fumes, gases, respiratory irritants, and extremes of temperature and humidity; can only do work not requiring more than superficial interaction with the general public, coworkers and supervisors; [and] is restricted to simple and repetitive tasks.[7]

(AR 81-82). *See* O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2010) (hypothetical omitting the terms "concentration, persistence and pace" sufficient "when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform"); Allbritten v. Astrue, 2012 WL 243566 at *7 (N.D. Ind. Jan. 25, 2012) ("hypothetical question was entirely consistent with the ALJ's RFC finding, which . . . stated simply that Plaintiff was limited to performing simple, unskilled work that involved no more than superficial contact with other people") .

The ALJ built a logical bridge between the evidence and his findings with respect to the severity of Mr. Geren's mental impairments, residual functional capacity, and ability to perform a significant number of jobs, and substantial evidence supports his decision. The law requires nothing more. Skinner v. Astrue,

---

[7] At the administrative hearing, the ALJ stated that "superficial interaction" referred to "the depth of the conversation and interaction and not to the frequency of it...In other words, a person who is working at the cash register can say good morning, nice weather, how are you today, superficial questions like that, but not to get involved with finances, politics and so forth and so on." (AR 82).

478 F.3d at 841; <u>Rice v. Barnhart</u>, 384 F.3d at 368-369; <u>Clifford v. Apfel</u>, 227 F.3d at 869.

III.  CONCLUSION

For the foregoing reasons, the court AFFIRMS the decision of the Commissioner of Social Security.

SO ORDERED.

ENTERED:   <u>  March 22, 2012  </u>

<u>        /s/ Robert L. Miller, Jr.       </u>
Judge
United States District Court